HUNTER, JR., Robert N., Judge.
Shawn Hull, ("Defendant-Father") appeals from a permanent child custody order entered 10 March 2017. The order granted joint legal custody to Defendant-Father and Kendra Picotte, ("Plaintiff-Mother") as well as primary physical custody to Plaintiff-Mother. On appeal, Defendant-Father contends: (1) several of the trial court's findings of fact are not supported by competent evidence; (2) the trial court erred in applying a tender years presumption in favor of Plaintiff-Mother; (3) the trial court erred in granting final decision-making authority to Plaintiff-Mother; and (4) the trial court erred in denying Defendant-Father's motion for appointment of a parenting coordinator. For the following reasons, we affirm the trial court's order.
I. Factual Background
Plaintiff-Mother and Defendant-Father had a daughter, Megan[1] , born 30 April 2015. Plaintiff-Mother and Defendant-Father never married. They ended their romantic relationship in October 2014, prior to Megan's birth. Defendant-Father attended some pre-natal appointments and was present during the child's birth. Megan resided with Plaintiff-Mother, and Defendant-Father visited regularly. He took her to his mother's house a few days each week and kept the child for one day each weekend. Until March 2016, Defendant-Father's mother provided childcare for Megan during the work-week.
During the Spring of 2016, Defendant-Father began to seek more time with Megan, including overnight custodial time. Plaintiff-Mother contends Defendant-Father began to visit her house uninvited and on at least one occasion refused to leave when she requested him to. She also testified Defendant-Father made unreasonable requests, such as to be present when she bathed with the child and when she nursed her. Plaintiff-Mother also accused Defendant-Father of recording her in her home, without her consent, and then refusing to cease when she found out. The parties also had verbal disagreements which led to Plaintiff-Mother calling the police, but no charges were filed against Defendant-Father. These actions led Plaintiff-Mother to file a complaint for a domestic violence protective order, but the order was later dismissed.
On 14 June 2016, Plaintiff-Mother filed an action seeking child custody and child support. The trial court entered a Temporary Child Custody and Child Support Order on 23 September 2016, but Defendant-Father moved to set aside the order on the grounds it was submitted to the trial court without input from Defendant-Father's counsel. The trial court set aside the order, and entered a new Temporary Child Custody and Child Support Order ("Temporary Order") on 21 October 2016. The Temporary Order granted the parties joint legal custody and granted Plaintiff-Mother primary physical custody. The order granted Defendant-Father visitation on alternating weekends. Additionally, the order required both parents to enroll in Our Family Wizard, a website which would allow the parties to communicate via email messages. In describing permitted communication between the parties the order stated:
Except in urgent or emergent circumstances, all communications between the parties shall occur through [Our Family Wizard] and all communication shall concern or be regarding the minor child. In emergent or urgent circumstances, the parties may text or call the other. An emergency shall be defined as an unexpected and unscheduled closing of school or daycare, a medical emergency wherein the minor child is hospitalized or emergency medical services are required, an emergency related to the custodial parent, or an emergency of similar magnitude. The parties will use [Our Family Wizard] for all communication purposes, absent an emergency as stated above.
The order permitted each party to "call or video chat the minor child once per day, for a maximum of 15 minutes, to take place before the minor child goes to bed." Also, the order required each party to use the calendar feature on Our Family Wizard to notify the other party "where the minor child will be each day, while in each party's custody, if the child will not be with the custodial parent."
The permanent child custody hearing came on for trial on 6 February 2017. Following the hearing, the trial court entered an order granting the parties joint legal custody, with Plaintiff-Mother having final decision-making authority, and awarding primary physical custody to Plaintiff-Mother. Defendant-Father entered timely notice of appeal from this order.
II. Standard of Review
In a child custody case, the standard of review is "whether there was competent evidence to support the trial court's findings of fact[.]" Barker v. Barker, 228 N.C. App. 362, 364, 745 S.E.2d 910, 912 (2013) (quoting Shear v. Stevens Bldg. Co. 107 N.C. App. 154, 160, 418 S.E.2d 841, 845 (1992) ). "[T]he trial court's findings of fact are conclusive on appeal if supported by substantial evidence, even if there is sufficient evidence to support contrary findings. 'Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Peters v. Pennington, 210 N.C. App. 1, 12-13, 707 S.E.2d 724, 733 (2011) (quoting State v. Smith, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980) ) (citations omitted). "Whether [the trial court's] findings of fact support [its] conclusions of law is reviewable de novo." Hall v. Hall, 188 N.C. App. 527, 530, 655 S.E.2d 901, 904 (2008).
"Absent an abuse of discretion, the trial court's decision in matters of child custody should not be upset on appeal." Everette v. Collins, 176 N.C. App. 168, 171, 625 S.E.2d 796, 798 (2006). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." State v. Hennis, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988).
III. Analysis
On appeal, Defendant-Father contends: (1) several of the trial court's findings of fact are not supported by competent evidence; (2) the trial court erred in applying a tender years presumption in favor of Plaintiff-Mother; (3) the trial court erred in granting final decision-making authority to Plaintiff-Mother; and (4) the trial court erred in denying Defendant-Father's motion for appointment of a parenting coordinator. We address each contention in turn.
1. Specific Findings of Fact
On appeal, Defendant-Father first contends several of the trial court's findings of fact were not supported by competent evidence and were instead entered due to the trial court's bias in favor of Plaintiff-Mother. Defendant-Father contests findings of fact number 10, 20, 21, 22, 23, 28, 29, 30, 31, 32, 33, and 34. Those findings are as follows:
10. Since birth, the minor child has been in the exclusive care, custody, and control of the Plaintiff.
....
20. Defendant has been controlling, and has unrealistic expectations as to what communication is necessary between the parties in raising a minor child.
21. Defendant insists upon knowing where the child is at all times. This expectation is unreasonable.
22. The Court points to the December 8, 2016 entries in Our Family Wizard between the parties, in which the Plaintiff specifically states "I'm sure you've taken her places and not told me", which the Court determines is a response to the Defendant requiring to know where the Plaintiff is at all times with the minor child.
23. On December 7, 2016, the Defendant attempted to call the Plaintiff four times in multiple succession, and also continued to call the Plaintiff more times on December 8, 2016.
....
28. The Defendant has recorded the Plaintiff in her own home, without her knowledge, and in fact attempted to introduce such recordings into evidence during this hearing. The Court advised, as so required, that there could be criminal charges against Defendant if these recordings were published and made part of the court file. After hearing the suggestions of the Court, Defendant chose not to publish those recordings.
29. Defendant excessively uses Our Family Wizard, and abuses Our Family Wizard messages to unreasonably communicate with the Plaintiff.
30. In review of the Our Family Wizard messages between the parties, the Court finds most of these messages to be unnecessary, and that there was much harassment by the Defendant of the Plaintiff on Our Family Wizard.
31. Defendant has gone into the home of the Plaintiff, without her knowledge, and was in fact asked to leave. When Defendant would not leave, the police have been called to Plaintiff's home.
32. These abuses of Our Family Wizard; recordation of the Plaintiff by the Defendant without her knowledge; and Defendant going to the home of the Plaintiff without consent is harassment.
33. Defendant has harassed and continues to harass the Plaintiff, the mother of the minor child.
34. Telephonic and/or video communication has been abused by the Defendant, and he asks questions of a 21-month-old that the minor child cannot answer.
A. Finding of Fact 10
Defendant-Father contends finding of fact number ten is not supported by the evidence. This finding of fact states: "[s]ince birth, the minor child has been in the exclusive care, custody, and control of the Plaintiff." Defendant-Father contends this finding is not supported by the evidence, because he presented evidence tending to show he exercised regular custodial time with the minor child, since her birth. We agree.
Plaintiff-Mother testified the minor child resided with her from the time of her birth, and Defendant-Father regularly visited the child at Plaintiff-Mother's house. Defendant-Father took Megan to his mother's house one or two days per week, and he kept her for one day each weekend. Defendant-Father did not keep Megan overnight until after entry of the Temporary Order.
The phrase "care, custody, and control" is not defined by North Carolina law. We determine under the ordinary meaning of the terms, it cannot be said Plaintiff-Mother had "exclusive" care, custody and control of the minor child. It is undisputed Defendant-Father regularly kept the children outside of Plaintiff-Mother's presence, a fact which precludes a finding that Plaintiff-Mother exercised exclusive custody, care, and control. We, thus, conclude finding of fact number ten is not supported by the evidence.
B. Findings of Fact 20, 29, and 30
Defendant-Father also contests findings of fact number twenty, twenty-nine, and thirty. These findings state:
20. Defendant has been controlling, and has unrealistic expectations as to what communication is necessary between the parties in raising a minor child.
....
29. Defendant excessively uses Our Family Wizard, and abuses Our Family Wizard messages to unreasonably communicate with the Plaintiff.
30. In review of the Our Family Wizard messages between the parties, the Court finds most of these messages to be unnecessary, and that there was much harassment by the Defendant of the Plaintiff on Our Family Wizard.
The record evidence tends to show Defendant-Father repeatedly visited Plaintiff-Mother's house uninvited, and refused to call or text her beforehand as she requested. Documentary exhibits admitted at trial indicate Defendant-Father called Plaintiff-Mother eleven times in one night during October 2016. Defendant-Father insisted these calls took place during his scheduled phone call with Megan, and he accused Plaintiff-Mother of hanging up on him and interfering with the fifteen minutes of video chat the Temporary Order allowed. Plaintiff-Mother told Defendant-Father the child hung up the phone each time and his attempts to force her to maintain a longer phone conversation caused unnecessary stress on the toddler.
Again from 7 December to 8 December, Defendant-Father called Plaintiff eight times and sent multiple text messages demanding to talk to the child, claiming there was an emergency. Plaintiff-Mother testified because the child was in her care at the time, she did not believe there was an emergency which constituted a need to return Defendant-Father's call. In response to a letter concerning the excessive messages, Defendant-Father's attorney stated Defendant-Father accidently sent the messages, because he has large fingers.
Defendant-Father also repeatedly requested Plaintiff-Mother provide daily updates regarding the child's activities and wellbeing. For example on 30 September 2016, Defendant-Father messaged Plaintiff-Mother stating: "[c]an you please respond to the last message I sent you? I have not received any updates from you in 2 days about what [Megan] has been doing. Please tell me all about her new things." On 3 October he messaged her: "[c]an you please give me ... daily updates of how she is doing. It seems you would know ... what is important to me and I wouldn't have to specifically ask each day but if you want me to ask each day I will." Again, on 6 October he messaged her: "I see you have chosen to not message me back yet again! This is the 3rd time now. You are in contempt! Please try to remember to message me at least once a day about new things with [Megan]."
Defendant-Father argues the evidence reveals his pattern of openly sharing information about the child with Plaintiff-Mother during his custodial time. He also contends his requests for information concerning childcare and the routines Plaintiff-Mother follows were for the purpose of maintaining the same routines during his time with Megan. We conclude the trial court's finding regarding Defendant-Father's use of Our Family Wizard is supported by substantial evidence.
C. Findings of Fact 21 and 22
Defendant-Father further contests findings of fact number twenty-one and twenty-two. These findings state:
21. Defendant insists upon knowing where the child is at all times. This expectation is unreasonable.
22. The Court points to the December 8, 2016 entries in Our Family Wizard between the parties, in which the Plaintiff specifically states "I'm sure you've taken her places and not told me", which the Court determines is a response to the Defendant requiring to know where the Plaintiff is at all times with the minor child.
Defendant-Father contends there is no evidence in the record to suggest he insisted on knowing Megan's whereabouts "at all times." He alleges his communications complied with the requirements of the Temporary Order which ordered each party to notify the other of the child's whereabouts, if not with the custodial parent.
On 15 September 2016, Defendant-Father messaged Plaintiff-Mother stating "please fill in the [Our Family Wizard] with ALL things concerning [Megan's] whereabouts! This would include but not be limited to: when you have her, when anyone other than you has her, where she will be watched, where I am to be picking up [Megan] and dropping her off ...." He also requested Plaintiff-Mother's sister's email address, in order to contact her regarding the details of [Megan's] time with her. He also sent messages wanting to know whether Plaintiff-Mother's family members watched Megan on the weekends. He messaged Plaintiff-Mother: "[c]an you please respond to the last message I sent you? I have not received any updates from you in 2 days about what [Megan] has been doing. Please tell me all about her new things." Again, he messaged her: "I see you have chosen to not message me back yet again! This is the 3rd time now. You are in contempt! Please try to remember to message me at least once a day about new things with [Megan]." And "[c]an you please give me ... daily updates of how she is doing. It seems you would know ... what is important to me and I wouldn't have to specifically ask each day but if you want me to ask each day I will."
On 5 December 2016, he texted Plaintiff-Mother "[w]here did [Megan] spend last weekend? Did you take her out of state? Why did you get defensive when I asked where you were? Do you not think it is appropriate for the father of one's child to ask and receive an answer about the whereabouts of said child?"
We agree these messages tend to show Defendant-Father unreasonably insisted on knowing the minor child's whereabouts at all times. The Temporary Order only required the parties to notify each other of the child's whereabouts when the child is not with the custodial parent. The custodial parent is not required to tell the non-custodial parent the details of their time with the child, nor does the order require "daily updates" on the child's activities and behaviors. Thus, there is substantial evidence to support the trial court's findings of fact number twenty-one and twenty-two.
D. Findings of Fact 23 and 34
Defendant-Father challenges findings of fact number twenty-three and thirty-four which state:
23. On December 7, 2016, the Defendant attempted to call the Plaintiff four times in multiple succession, and also continued to call the Plaintiff more times on December 8, 2016.
....
34. Telephonic and/or video communication has been abused by the Defendant, and he asks questions of a 21-month-old that the minor child cannot answer.
The trial court's finding Defendant-Father excessively called Plaintiff-Mother is supported by the evidence and Defendant-Father does not deny he successively called Plaintiff-Mother on 7 and 8 December, nor does he deny sufficient evidence supported these findings. However, Defendant-Father contends the Temporary Order expressly authorized these communications. We disagree.
The Temporary Order authorized each party to call or video chat with the minor child "once per day." "If the minor child is close to bedtime and the non-custodial parent has not yet called, the custodial parent shall call the non-custodial parent to speak with or video chat ... with the minor child." The order specifically forbids each party from assaulting, threatening, or harassing the other party. Repeated, successive phone calls can constitute harassment. If Plaintiff-Mother does not abide with the order in allowing Defendant-Father to speak with the child once per day, then Defendant-Father's remedy is to file an action for contempt, not to repeatedly harass her with excessive phone-calls.
E. Findings of Fact 30, 32, and 33
Defendant-Father challenges findings of fact number thirty, thirty-two, and thirty-three which state:
30. In review of the Our Family Wizard messages between the parties, the Court finds most of these messages to be unnecessary, and that there was much harassment by the Defendant of the Plaintiff on Our Family Wizard.
....
32. These abuses of Our Family Wizard; recordation of the Plaintiff by the Defendant without her knowledge; and Defendant going to the home of the Plaintiff without consent is harassment.
33. Defendant has harassed and continues to harass the Plaintiff, the mother of the minor child.
Defendant-Father contends these findings should be set aside because his behavior was not unreasonable "when considered in the context of a father who wished to spend more time with his child while the mother actively undermined his involvement by hiding the child, not informing him of medical appointments, and not allowing him to meet the child's regular babysitter." Defendant-Father contends the trial court's use of the term "harassment" and "harassing" in these findings of fact was inappropriate, as his behavior does not meet the statutory definition of "harassment." Defendant-Father cites N.C. Gen. Stat. § 14-277.3A(b)(2) which defines harassment in the criminal code, and N.C. Gen. Stat. § 50B-1(a)(2), which employs the same definition in the context of domestic violence.
"Harassment" is defined in those sections as "[k]nowing conduct, including written or printed communication or transmission, telephone, cellular, or other wireless telephonic communication, ... directed at a specific person that torments, terrorizes, or terrifies that person and that serves no legitimate purpose." N.C. Gen. Stat. § 14-277.3A(b)(2) (2017).
Our review of the record does not indicate Defendant-Father's conduct rises to the level of criminal harassment, or domestic violence as defined in our statutes. However, substantial evidence was presented which indicates Defendant-Father sent excessive, unnecessary messages through Our Family Wizard, he recorded Plaintiff-Mother without her knowledge, and went to her house without her consent. The trial court did not abuse its discretion to use the term "harassment" in the ordinary meaning of the term-"to trouble, worry, or torment, as with ... repeated questions or demands[.]" Harass, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (5th ed. 2014).
F. Finding of Fact 31
Defendant-Father argues there is no evidence in the record to support finding of fact number thirty-one which states: "Defendant has gone into the home of the Plaintiff, without her knowledge, and was in fact asked to leave. When Defendant would not leave, the police have been called to Plaintiff's home." Defendant-Father contends he believed he had permission to enter Plaintiff-Mother's home and upon learning Plaintiff-Mother did not want him in her home, he left. At the hearing, the following exchange occurred:
Q. You were inside her home without permission?
A. I was inside her home, but I had permission.
Q. Did you have the Plaintiff's permission to be inside her house on that day?
A. Yes and no. ... [I]t was not uncommon for me to utilize the key that was at her brother-in-law and sister's house to be able to gain access to Kendra's house. ... I did previously live there, and the idea was I was setting up for her birthday party. And the new car seat that I had purchased was actually in Kendra's house. And ... I was going to need that. So it was fine up until that day, and then, only during that day did it become apparent that now it's not fine.
....
Q. When you were inside of her home, and she found out you were there and asked you to leave, did you?
A. Yes.
Q. Are you sure?
A. Yes.
However, in response to a question from the court, Defendant-Father gave a different answer.
THE COURT: And ... were you ever asked to leave and you refused to leave her house?
THE WITNESS: I believe there was one occasion that I was asked to leave and I did not leave. But I ... did not leave right away, but I did leave before the police got there, and then I waited, and I explained the situation.
Therefore, we conclude there is substantial evidence to support finding of fact number thirty-one, based on Defendant-Father's own admission he went to Plaintiff-Mother's house without her knowledge, and did not leave when she asked him to.
In sum, although we conclude finding of fact number ten is not supported by competent evidence, the remaining findings of fact are supported by substantial evidence in the record. We determine these findings support the trial court's conclusion it is in the best interest of the child to award primary physical custody to Plaintiff-Mother.
2. Tender Years Presumption
Defendant-Father next argues the trial court erred in applying a tender years presumption in favor of Plaintiff-Mother, and in demonstrating overt bias against Defendant-Father, who proceeded pro se at trial. Particularly, Defendant-Father alleges the trial court was courteous to Plaintiff-Mother and permitted her to testify uninterrupted. However, he contends the trial court was "antagonistic" toward him, "lectured Defendant on the need to co-parent, surveyed the audience about the difficulty of parenting, and carried on a lengthy and adversarial questioning of Defendant in which the trial court rarely (if ever) permitted Defendant to complete his answers."
Further, Defendant-Father attempted to introduce into evidence a recording of a conversation which occurred between him and Plaintiff-Mother, of which Plaintiff-Mother was not aware Defendant-Father recorded. The trial court chastised Defendant-Father, and warned him he could be criminally charged if he introduced the recording into evidence. Defendant-Father then decided not to introduce the recording.
On appeal, Defendant-Father argues the trial court's misapprehension of the law affected findings of fact number twenty-eight, thirty and thirty-one. He further contends, the trial court's comments and demeanor towards him evidences a tender years presumption in favor of Plaintiff-Mother. We disagree.
Defendant-Father relies on our prior decision Greer v. Greer. 175 N.C. App. 464, 624 S.E.2d 423 (2006). In Greer, we recognized the "tender years" doctrine is no longer applicable in North Carolina, instead " '[b]etween the mother and father, whether natural or adoptive, no presumption shall apply as to who will better promote the interest and welfare of the child.' " Greer at 470, 624 S.E.2d at 427 (quoting N.C. Gen. Stat. § 50-13.2(a) ) (italics omitted). In Greer, we reversed the trial court's order for split physical custody because the trial court "did not view the father as equal to the mother and did not evaluate the evidence independent of any presumptions in favor of the mother. Instead, the trial court used language in the order that cannot be distinguished from the abolished presumption[.]" Id. at 471, 624 S.E.2d at 428. For example, the trial court found "the law of nature dictates that early in the life of a child, the mother has a distinct advantage in the opportunity to care for that child" and "that by the very nature of the age and gender of the minor child (28-month-old female), as it relates to the Defendant, that placement with the Defendant would be a negative aspect ...." Id. at 471-72, 624 S.E.2d at 428.
Our review of the record in this case reveals no such language which would indicate the trial court applied a presumption in favor of Plaintiff-Mother. We agree with Defendant-Father the transcript of the hearing does seem to suggest the trial court at times interrupted Defendant-Father and made sarcastic comments. The trial court did not demonstrate patience towards Defendant-Father, who represented himself at trial. However, as stated above, the trial court's findings of fact are supported by competent evidence in the record and these findings support the trial court's award of primary physical custody to Plaintiff-Mother. Therefore, we cannot conclude the trial court exercised a presumption in favor of Plaintiff-Mother.
3. Final Decision-Making Authority
Defendant-Father next contends the trial court abused its discretion in awarding final decision-making authority to Plaintiff-Mother. Defendant-Father contends the trial court's findings of fact do not explain why deviation from pure joint legal custody is necessary, and they do not justify an award of final decision-making authority to Plaintiff-Mother. We disagree.
This Court has held legal custody "refer[s] generally to the right and responsibility to make decisions with important and long-term implications for a child's best interest and welfare." Diehl v. Diehl, 177 N.C. App. 642, 646, 630 S.E.2d 25, 27 (2006). Our General Assembly has not defined the term "joint legal custody" which this Court has acknowledged "implies a legislative intent to allow a trial court 'substantial latitude in fashioning a "joint [legal] custody" arrangement.' " Id. at 647, 630 S.E.2d at 28 (quoting Patterson v. Taylor, 140 N.C. App. 91, 96, 535 S.E.2d 374, 378 (2000).)
Defendant-Father relies on Diehl v. Diehl to support his argument. In Diehl the father appealed from a trial court order granting the parents joint legal custody, but simultaneously granting the mother primary decision-making authority on all matters, unless they had a "substantial financial effect" on the father. Diehl at 645-46, 630 S.E.2d at 27-28. The trial court concluded as a matter of law "[b]oth parties are fit and proper to have joint legal custody of the minor children." Id. at 647-48, 630 S.E.2d at 29. The trial court also made findings "regarding the parties' difficulty communicating and Ms. Diehl's occasional troubles obtaining Mr. Diehl's consent." Id. Yet, on appeal this Court concluded the trial court's findings were insufficient to support the conclusion granting primary decision-making authority to Ms. Diehl. Id. We concluded the trial court did not make findings "sufficient to support an order abrogating all decision-making authority that Mr. Diehl would have otherwise enjoyed under the trial court's award of joint legal custody."Id. We also noted, the trial court's findings pertained predominately to physical custody rather than legal custody. Id.
Here, as in Diehl, the trial court awarded joint legal custody to both parties, but it also concluded, should the parties fail to agree, Plaintiff-Mother shall have final decision-making authority. The trial court also awarded exclusive decision-making authority to Plaintiff-Mother in regard to the daycare provider of the child.
Here, the trial court made numerous findings of fact concerning the parties' inability to communicate effectively. It also made several findings concerning Defendant-Father's unrealistic expectations for communication, his excessive use of Our Family Wizard, his harassment of Plaintiff-Mother through this means of communication, his recording Plaintiff-Mother without her knowing it, and his presence in her home without her consent, and refusal to leave when asked. The trial court also found Plaintiff-Mother had been responsible for providing child care for the minor child. Unlike Diehl, here these findings bear on Defendant-Father's fitness to exercise both physical and legal custody. Therefore, we determine the trial court did not abuse its discretion in awarding final decision-making authority to Plaintiff-Mother.
4. Appointment of a Parenting Coordinator
In his final argument on appeal, Defendant-Father contends the trial court erred in denying his motion for appointment of a parenting coordinator. In finding of fact number thirty-seven the trial court found this case is not a "high-conflict child custody case." Defendant-Father argues this finding of fact is in direct conflict with the trial court's other findings of fact.
Under North Carolina law, the trial court "may appoint a parenting coordinator at any time during the proceedings of a child custody action involving minor children ... if all parties consent to the appointment." N.C. Gen. Stat. § 50-91(a) (2017) (emphasis added). If the parties do not consent to the appointment of a parenting coordinator,
The court may appoint a parenting coordinator ... upon entry of a custody order other than an ex parte order, or upon entry of a parenting plan only if the court also makes specific findings that the action is a high-conflict case, that the appointment of the parenting coordinator is in the best interests of any minor child in the case, and that the parties are able to pay for the cost of the parenting coordinator.
N.C. Gen. Stat. § 50-91(b) (2017). A high-conflict case is defined as a child custody action in which the parties "demonstrate an ongoing pattern of" several behaviors including "[d]ifficulty communicating about and cooperating in the care of the minor children." N.C. Gen. Stat. § 50-90 (2017).
Here, the trial court found this case did not constitute a high-conflict custody case. We disagree with this finding, because substantial evidence and findings of fact indicate the parties do in fact demonstrate a pattern of inability to communicate effectively regarding the care of the minor child. However, the trial court was within its discretion to determine appointing a parenting coordinator was not in the best interest of the minor child.
IV. Conclusion
For the foregoing reasons, we affirm the trial court's order.
AFFIRM.
Report per Rule 30(e).
Judges INMAN and BERGER concur.

A pseudonym is used to protect the identity of the juvenile involved in this case.